

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

F I L E D

SEP 1 2 2006

CLERK'S OFFICE
DETROIT

WILL JOHNSON,

    Plaintiff,

v.

BENCY MATHAI, et al.
    Defendants.
_____/

CIVIL ACTION NO. 06-11608
DISTRICT JUDGE ROBERT H. CLELAND
MAGISTRATE JUDGE MONA K. MAJZOUB

## MOTION TO ADD OTHER DEFENDANT NAMES TO PLAINTIFF'S 42 USC 1983

Now comes the Plaintiff, **Will Johnson**, acting in **Pro Per**, and hereby moves this Honorable Court, and says in support:

1.   Plaintiff, WILL JOHNSON, (hereinafter referred to as Plaintiff), is a prisoner-litigant acting **Pro Per**, presently incarcerated in a Michigan Facility, located at the South Complex of Jackson, in Jackson, Michigan.

2. Defendant, **Doctor Bency Mathai**, (hereinafter referred to as Defendant(s), is a Chief Medical Officer, employed by the Michigan Medical Services (CMS) at 3100 Cooper Street, Jackson, MI 49201, is being sued in her individual capacity, and will be represented by the Attorney General for the State of Michigan, Mike Cox., and the attorney of record for the Defendant, who will be the Assistant Attorney.

1

3. Defendant, **Dr. Emmanuel Johnson,** (hereinafter referred to as Defendant(s), is employed by the Michigan Medical Services (CMS) at 1790 East Parnall Road, Jackson, MI 49201, is being sued in his individual capacity, and will be represented by the Attorney General for the State of Michigan, Mike Cox, and the attorney of record for the Defendant, who will be the Assistant Attorney.

4. Defendant, **Dr. Savi Conney** (hereinafter referred to as Defendant(s), is employed by the Michigan Medical Services (CMS) at 1790 East Parnall Road, Jackson, MI 49201, is being sued in his individual capacity, and will be represented by the Attorney General for the State of Michigan, Mike Cox, and the attorney of record for the Defendant, who will be the Assistant Attorney.

5. This Defendant, **Dr. Keith Camann** was my Doctor in 2003/2004 here at SMT Parnall Correctional Facility, (new address unknown at this time) but, medical records will show that he was incompetent and negligent to my medical care, mis-diagnosed, delayed and denied me treatment, and withheld pain medication and provided poor accommodations, is being sued in his individual capacity, and will be represented by the Attorney General for the State of Michigan, Mike Cox, and the attorney of record for the Defendant, who will be the Assistant Attorney.

6. Defendant, **Correctional Medical Services Inc.,** 703 Ball Ave Ne, Grand Rapids, MI United States, Phone : (616) 336-0183, (Correctional Medical Services Inc., a controversial Missouri–based company, for primary care physicians and other services.). Court documents, medical records and interviews with dozens of prisoners and their advocates show that incompetent and negligent medical care, mis-diagnoses, delayed or denied treatment, withheld pain medication and poor accommodations for people with disabilities are common in Michigan prisons – and have been for

decades.

 MDOC has been under a federal consent degree in a case called __*Hadix*__ since 1985 to improve medical care and other conditions at state prisons in Jackson. Even so, medical care has probably gotten worse since 2000, when CMS took over the contract for primary care. CMS has maintained it "provides medical care that's evidence-backed and medically necessary, and those services are provided at the community standard of care." But there's plenty of evidence of serious, public reported problems with the company's performance in state prison systems around the country. **(SEE 15 PAGE APPENDIX (" #15 ")**

7. Plaintiff is a Pro Per litigant, and avers that the actions of these Defendants set forth with particularity in the complaint, rises to the level of being infringement of the protections of the Amendment VIII of the United States Constitution; that these defendants were not acting within the scope of their professional or prescribed duties, and that their actions contravene the Constitutions, statutes, administrative rules and written agency rules which govern and delegates their authority as Medical Physicians or medical doctors.  **(SEE 15 PAGE APPENDIX (" #15 ")**

---

**[1] CRIMINAL LAW k1213.10(3)**
**110k1213.10(3)**

**Not every refusal of medical treatment constitutes cruel and unusual punishment, and where to draw the line is a question of judgment that does not lend itself to mechanical resolution, but is a matter of determining the civilized minimum of public concern for health of prisoners, which depends on particular circumstances of individual prisoner.  U.S.C.A. Const.Amend. 8.**

3

I, **WILL JOHNSON,** therefore, request that this Court ***GRANT*** Motion to Add Other

Defendants Names to Plaintiff's 42 USC 1983.


Respectfully Requested and Submitted,


*Johnson Will* #112495


cc : file


Date : 9 / 3 /2006

**PATRICIA A. STREETER**
Attorney at Law
221 North Main Street, Suite 300
Ann Arbor, Michigan 48104
U.S.A.


Patricia Streeter has helped companies and individuals in the midwest of the United
States of America with their legal matters for over twenty-five (25) years. She has a
background in a wide variety of areas, including business consulting, mediation and case
evaluation, civil and criminal litigation, complex federal litigation, and international
business and trade issues.  Ms. Streeter is licensed to practice law in the States of
Michigan and Illinois. Her law office is in Ann Arbor, Michigan, U.S.A.

### AREAS OF PRACTICE AND FEES

Ms. Streeter's experience includes business consulting, mediation and case evaluation, civil and criminal
litigation, complex federal litigation, and international business and trade issues.

### General Practice Areas

As a general practitioner she is qualified to provide and has provided advice on a wide variety of matters,
including:

Probate (wills and trusts)
Real estate (closings, preparing deeds)
Business advising (partnership agreements and business formation)
Criminal Defense (primarily in federal courts)

# Begin Cure for Prison Health Care

*June 23, 2006*

No one fully understands the state of medical care in Michigan prisons, but snapshots of that system from an investigation by Jeff Gerritt of the Free Press editorial board suggest it's dangerously dysfunctional. Legislators should not wait until the state's contract with Correctional Medical Services Inc. ends on March 31. They must provide more oversight now or invite further court intervention in the prison system, encourage costly lawsuits and perpetuate a standard of care that is inhumane and unconstitutional.

Medical records, court documents and interviews with inmates and advocates show longstanding systemic problems with the medical care delivered to Michigan's 50,000 inmates. These include misdiagnosis, delayed or denied treatment and inadequate accommodation for people with disabilities.

Legislators can start fixing these problems by appointing a medical ombudsman to investigate hundreds of inmate complaints about health care. That office should employ a physician, or at least have access to consultants who are doctors or medical experts. A medical ombudsman has become even more necessary since the Legislature closed the general office of the Corrections ombudsman in 2003. Now, the worst abuses stand little chance of even getting heard.

Second, the state should create a streamlined grievance process for prisoner medical complaints. General grievance procedures are lengthy, cumbersome and often ineffective -- definitely not suited for addressing issues that potentially mean life or death.

Finally, lawmakers ought to order a review of prison healthcare to determine how CMS is performing. They should ensure that Corrections exercises proper oversight and that state health care administrators wield the authority to change how CMS operates. Now, the Legislature receives practically no information about CMS, even though the Missouri-based company receives roughly $65 million a year from Michigan taxpayers.

A prison sentence rightfully deprives an offender of his freedom. But it ought not subject prisoners to aggravated health problems, unnecessary suffering and even death. In one case, an inmate serving a one- to four-year sentence for fleeing a police officer was diagnosed with cancer but not treated for nearly a year. He now has only a year to live.

A veritable death sentence for a minor crime is unjust by any standard of decency, and legislators can no longer claim they don't know.

To refuse to act now is practically criminal.

**Copyright © 2006 Detroit Free Press Inc.**

Free Press
freep.com

# Granholm orders review of prison health care system

## Move follows probe of death, longtime troubles

**BY JEFF GERRITT**
FREE PRESS EDITORIAL WRITER

*August 22, 2006*

Gov. Jennifer Granholm on Monday ordered an independent review of the troubled prison health care system.

"If changes are warranted, changes will be made," said Liz Boyd, the governor's spokeswoman.

The move follows a Free Press investigation that revealed widespread problems with how medical care is delivered to the state's 50,000 inmates, including the Aug. 6 death of a mentally ill inmate who had spent most of his last four days in four-point restraints.

The review won't be done by an agency within state government, Boyd said. "It should be an independent review," she said.

The Corrections Department has asked the National Institute of Corrections in Washington, D.C., a U.S. Department of Justice agency, to advise Michigan on how to review the health care system, which covers nearly 50 prisons, spokesman Russ Marlan said.

Neither Marlan nor Boyd could say when the review would begin or how long it would take.

"We want to move as quickly as we can," Boyd said.

The review will cover the entire $190-million-a-year prison health care system, including a $70-million contract with Missouri-based Correctional Medical Services Inc., and the additional $90 million a year the state spends on mental health services, Marlan said.

"This will include everything," Marlan said. "It will cover CMS, our employees, our interaction with the Department of Community Health, and both the mental and physical aspects of health care."

Any reviewing body should include prisoner advocates, said Sandra Bailiff Girard, executive director of Prison Legal Services of Michigan.

"The department showed no interest in this prior to these stories," Girard said. "There's a tendency among professionals to discount prisoner perspectives."



Lloyd Byron Martell, 41, was paroled from Southern Michigan Correctional Facility in Jackson after being diagnosed with cancer. His mother, Donna Martin of Dearborn, meets him in Detroit Aug. 15. (KIMBERLY P. MITCHELL/Detroit Free Press)

**What's at stake**

The $190-million-a-year prison health care system that covers 50,000 prisoners in the state's nearly 50 prisons.

**The problems**

● An investigation by Free Press editorial writer and columnist Jeff

Problems with prison health care are long-standing. State prisons in Jackson have been under a federal consent decree since 1985 to improve medical care and other conditions. But prisoner advocates say health care has worsened since 2000, when CMS took over the contract for primary care. Prison officials and the company have maintained that CMS has performed adequately.

"We certainly have participated in reviews of inmate health care in other states and generally work well with those type of procedures," CMS spokesman Ken Fields said Monday.

The Free Press found widespread problems with misdiagnosis, delayed or denied treatments and inadequate accommodations for people with disabilities. Many of the problems are documented in hundreds of pages of court rulings filed in federal court.

The cases that sparked the review include the death of Timothy Joe Souders, a 21-year-old mentally ill inmate who was sentenced to 1-4 years for resisting arrest and assault. He died Aug. 6 after being tethered to his bed in a hot isolation cell for most of four days.

In another case, doctors failed to treat a cancerous polyp in Lloyd Byron Martell, 41, who was sentenced to 1-4 years for fleeing a police officer.

Martell was released last week -- sent home to die.

Another inmate, Martinique Stoudemire, 27, who is serving 11-30 years for her part as a driver in several armed robberies committed by her brother, had both lower legs amputated after doctors reportedly ignored symptoms related to lupus and blood problems.

Contact *JEFF GERRITT* at 313-222-6585 or gerritt@freepress.com.

Copyright © 2006 Detroit Free Press Inc.

Gen
misdiag
treatments a
troubles plaguin
system, in some ca
effectively turning shor
sentences into death
sentences.

What's next

• A widespread review
by the state and
changes in the system if
warranted.

**To read** previous
coverage, go to
freep.com.

**Press**
eep.com

# JEFF GERRITT | UNHEALTHY CONFINEMENT: Inmates aren't the only ones who pay for poor medical care in prison

## Long-term costs will be more for everyone

August 21, 2006          *Read This*

*One in an occasional series of columns on problems with the health care system for state prison inmates.*

Michigan legislators remain blissfully ignorant about a big and growing part of the state budget, despite widespread evidence of almost criminal incompetence and negligence in how the money is spent.

The state shells out $190 million a year on prison health care, including more than $70 million to Correctional Medical Services Inc., a controversial Missouri-based company, for primary care physicians and other services.

But there's ample evidence, for anyone who cares to look, that the state is not only violating its constitutional duty to provide adequate medical care to prisoners, but also spending more on serious medical problems that could have been prevented. Just in the last week, I reported on a 41-year-old inmate who went home to die after prison doctors failed to treat his cancer, and another 21-year-old prisoner who died in Jackson, after spending most of his last four days strapped to a bed in four-point restraints in a hot cell. Michigan is inviting further court intervention into how it runs its nearly 50 prisons.

Still, legislators have failed to provide real oversight. Even Senate Majority Leader Ken Sikkema, R-Wyoming, one of the state's most capable, experienced and knowledgeable legislators, appeared clueless when I asked him recently about the issue. Practically the only information legislators receive on the CMS contract is a one-page summary twice a year. A July 1 report to the Legislature summed up the quality of prison health care in one sentence: "Investigation of prisoner grievances, family complaints and issues brought to the MDOC by legislators have assured that the quality of services provided by CMS meets MDOC expectations."

That statement mocks the Michigan Department of Corrections' mantra of "Expecting Excellence Every Day."

Court documents, medical records and interviews with dozens of prisoners and their advocates show that incompetent and negligent medical care, misdiagnoses, delayed or denied treatment, withheld pain medication and poor accommodations for people with disabilities are common in Michigan prisons -- and have been for decades.

MDOC has been under a federal consent decree in a case called Hadix since 1985 to improve medical care and other conditions at state prisons in Jackson. Even so, medical care has probably gotten worse since 2000, when CMS took over the contract



**A summary of some of CMS' legal problems:**

• Last October, CMS settled a wrongful death lawsuit in Delaware, the terms of which were kept secret. Anthony Pierce, serving a 14-month sentence for parole violation on a burglary charge, developed a 10-inch lump on his skull, almost like a second head. CMS medical staff ordered no tests or treatment, the suit states, but an autopsy report after the 21-year-old's death determined the lump was cancerous.

• In June, Wyoming paid $50,000 to settle a federal lawsuit filed by a former inmate who blamed CMS and that state's Department of Corrections for the loss of his lower right leg. The lawsuit claims treatment for the diabetic prisoner was delayed until "after his foot literally exploded from infection and swelling" and had to be amputated on May 2, 2003.

e. CMS has maintained it "provides medical care that's evidence
medically necessary, and those services are provided at the community
of care." But there's plenty of evidence of serious, publicly reported
problems with the company's performance in state prison systems around the country.

A report filed this month in U.S. District Court by Dr. Jerry S. Walden of Ann Arbor, an expert witness in the Hadix case, concludes that Michigan's problems are getting worse, not better, and pose a serious health risk. Walden found that delays and disruptions in patient care were routine, sometimes resulting in death, and even basic medical records were poorly maintained and organized. Due to a "clerical error," Walden reports, almost no death certificates were recorded this spring for inmates who died in the Jackson prisons covered by the Hadix decree.

Walden described the system as a "culture of failure," lacking leadership and unable to prevent unnecessary suffering and death.

"I am convinced that the necessary leadership will never be in place until CMS is ousted," he concluded.

Whether or not it gets to that point, oversight by state government is crucial because most cases of medical neglect remain secret.

The idea that medical malpractice will be exposed through families, inmate grievances or lawsuits is plain crazy. Families trying to get information or help are ignored. Inmate medical grievances receive no independent investigation and are routinely rejected. Most attorneys won't touch inmate lawsuits because of the costs to hire expert witnesses, the difficulties in obtaining information and records, and the reluctance of juries to compensate prisoners. Many lawsuits are dismissed because inmates can't even find out who's at fault.

But legislators, indifferent to a cause that has no constituency, aren't eager to act.

If anything, Michigan is making it even harder for information to get out. In 2003, the Legislature closed its independent Corrections ombudsman office, which investigated complaints from inmates and their families. Health care had become the top complaint, said Charlene Lowrie, a retired investigator for the ombudsman's office. In the same year, the MDOC booted Prison Legal Services of Michigan, which is funded mostly by inmates, out of its Jackson prison office, eliminating the help it got from inmate paralegals. Last year, the department started charging a minimum of $20 for a copy of any inmate medical record, instead of 25 cents a page -- a real hit for an agency with an annual budget of roughly $130,000 a year.

The American Friends Service Committee of Ann Arbor, another small nonprofit that monitors prison health care, annually requests a list of inmates who died in prison. This year, the department provided the names but declined to list the cause of death.

Inmates like 27-year-old Martinique Stoudemire have almost no chance of getting help or redress. When Stoudemire walks out of prison -- if she walks at all -- she'll do it on prostheses. Both her legs were amputated below the knees in prison: the right one in December 2003, the left one in January.

It could have been avoided, Stoudemire said, but doctors ignored her severe chest

---

• In 1999 and early 2000, the Virginia Department of Corrections fined CMS hundreds of thousands of dollars for failing to fulfill its contract to provide medical care to prisoners. Virginia later decided to not renew its CMS contract.

• In September 1998, the St. Louis Post Dispatch reported that nearly one in four CMS doctors then working in Missouri prisons had been disciplined for misconduct.

**Source: Staff research**

**About this series**

For more than two months, Free Press editorial writer and columnist Jeff Gerritt has been examining the worsening state of health care in Michigan's prisons, which costs taxpayers $190 million a year. Misdiagnoses, delayed treatment and a host of other troubles plague the system, in some cases turning prison stays into death sentences.

From a mentally ill 21-year-old who was left strapped to a table for most of four days before he died, to inmate whose cancerous polyp was mistreated as a hemorrhoid and now, at 41, only has less than a year to live, Gerritt illuminated a health care system that has been far more punitive than the justice system itelf.

---

swelling in late 2002 and early 2003, even though they knew she had
of Lupus and blood problems. A blood clot caused the first amputation a
ter. Before her incarceration, doctors regularly monitored Stoudemire and
prescribed blood thinners, but she received no such care after she was locked up at
Scott Correctional Facility in Plymouth.

Stoudemire, who graduated from Oak Park High School in 1996 and attended
community college, said she deserved prison. She served as a driver for her brother,
who robbed several party stores between 2000 and 2002. Now at Huron Valley
Women's Prison in Ypsilanti, she's serving 11-30 years for armed robbery.

Still, losing her legs wasn't part of her sentence. Under the U.S. Constitution's
prohibitions against cruel and unusual punishment, Stoudemire and the rest of
Michigan's 50,000 prison inmates are entitled to adequate medical care -- and they're
not getting it.

Michigan doesn't have to spend more to do better. Making a proper diagnosis, treating
problems early, communicating with other medical staff and keeping records straight
don't cost more but can prevent bigger and costlier health problems, as well as
lawsuits, later.

If they don't want a federal judge to do it, legislators must monitor the quality of
health care in Michigan prisons, insist that CMS does its job or get rid of the company
when its contract expires next year.

***JEFF GERRITT*** *is a Free Press editorial writer. Contact him at*
*gerritt@freepress.com or 313-222-6585.*

**Copyright © 2006 Detroit Free Press Inc.**

## A QUALITY DEBATE

"My findings
are ...similar to my
previous findings but in
critical respects worse.
There are a series of
problems that interact to
create a serious danger
to the health of Hadix
class members."

**-- Report of Dr. Jerry S.
Walden, plaintiffs'
expert witness, July
10, 2006**

"Little that is
fundamental has
improved for prisoners in
Hadix facilities. Most
issues for prisoners with
disabilities are
inextricably linked with
systems problems that
impair the health care of
all prisoners. I continue
to find examples of pain,
unnecessary suffering,
and delays in
accommodations and
treatment.."

**-- Report of Elizabeth
J. Ferguson, plaintiffs'
expert July 10, 2006**

"Quality is monitored
through several internal
mechanisms. ...
Investigation of prisoner
grievances, family
complaints and issues
brought to the MDOC by
Legislators have
assured that the quality
of services provided by
CMS meets MDOC
expectations."

**-- Corrections
department report to
the Legislature, July 1,
2006**

ee Press
reep.com

# NEGLECT IN CUSTODY | A SPECIAL REPORT: Mentally ill inmate dies in isolation

## State reviews case; lack of care, heat in cell are issues

**BY JEFF GERRITT**
FREE PRESS STAFF WRITER

*August 20, 2006*

Timothy Joe Souders lived a hard life and, on Aug. 6, died an even harder death in a segregated prison cell in Jackson.

Souders, 21, spent most of his last four days naked, without physician or psychiatric care, his arms and legs bound to a steel bed in four-point restraints. He was in a bare, all-steel isolation cell about the size of a walk-in closet.

He went to the cell Aug. 2 because of unruly behavior. He lay in urine -- "agitated, disoriented, psychotic" -- as the cell felt close to 106 degrees at times, according to a report written by a federal monitor assigned to scrutinize medical care for Jackson prisons.

Souders was found dead on his bed around 4 p.m., two hours after staff had removed his shackles. The death of the severely mentally ill inmate is a glaring example of a troubled state prison health care system, riddled with misdiagnoses, delayed or denied treatment and inadequate accommodations for people with disabilities.

The Jackson prison complex, including the Southern Michigan Correctional Facility where Souders died, has been under federal oversight for more than 20 years.

Corrections officials are investigating the death. Autopsy results might not be available for two or three weeks.

The Michigan Attorney General's Office, which represents the Department of Corrections, disputed the account by the federal monitor, whose report this week brought Souders' death to light.

"The governor's office is very concerned about the issue of prisoner health care," Liz Boyd, spokeswoman for Gov. Jennifer Granholm, said Saturday. "We want to make sure that prisoners are getting appropriate health care and that taxpayer dollars are being spent wisely. Be assured, the issue of prisoner health care will be reviewed and, if changes are warranted, changes will be made."

The Corrections Department had issued a heat alert the day Souders went into isolation. Such alerts are issued when the combined temperature and humidity index reaches 90 degrees. Alerts are supposed to trigger actions to ensure that inmates have adequate water and ventilation.



Timothy Joe Souders, 21, of Adrian died in Jackson. He was bipolar and had other medical conditions.

**About this report**

For more than two months, Free Press editorial writer and columnist Jeff Gerritt has been examining the state of health care in Michigan's prisons, which costs taxpayers $190 million a year. Misdiagnoses, delayed treatments and other troubles plague the system, in some cases turning short sentences into death sentences.

**Important dates in Timothy Souders' fatal prison stay**

**Oct. 28:** Sentenced to 1- to-4 years for resisting arrest, assault and

Dr. Robert Cohen, the court-appointed monitor, uncovered Souders' death during a visit to the Jackson medical complex on Aug. 8-10. Disturbed by what he found, he issued a special report to U.S. District Judge Richard Enslen in Kalamazoo, who is enforcing federal oversight of the facilities.

"Although the circumstances of Mr. S.' death overwhelmed my visit ... there are a number of additional continuing serious deficiencies in the medical program which require immediate attention, some of which may have contributed to the abject failure to provide Mr. S. with medical care," Cohen wrote.

"There is a critical shortage of medical staff" at the Jackson facilities "and serious medical staff shortages throughout the medical program. This is an emergency situation which has gone on for too long and is having an extremely adverse effect on patient care."

Souders' death was "predictable and preventible," Cohen wrote, "a terrible, unnecessary tragedy."

Souders was serving a sentence of 1 to 4 years for resisting arrest, assault and destroying police property.

Because he was taking medications for multiple medical conditions -- including manic-depression, psychosis and hypertension -- he was at high risk for heat-related injury or death, Cohen wrote.

Still, a physician did not see him from the time he was restrained until he died. He was seen and monitored by nurses, however, Department of Corrections spokesman Russ Marlan said.

Mental health staff at the Southern Michigan Correctional Facility tried to transfer Souders to Huron Valley Center in Ypsilanti, a psychiatric hospital for prisoners, but he wasn't moved, Marlan said.

At least one person involved in the transfer has been removed, Marlan said. The department is reviewing policies on prisoner restraint.

## A 'lack of ... responsibility'

In response to Cohen's letter to the judge, the Attorney General's Office, which represents the Corrections Department, questioned some of Cohen's findings. The office pointed out in an e-mail to Cohen that the day Souders died, a nearby cell was only 83 degrees, with 58% humidity, which wouldn't produce a heat index of 106.

Shortly after 10 on the morning he died, Souders, 5-foot-8 and 235 pounds, was able to walk to the shower outside the cell, Marlan said. He was returned to the cell, placed in restraints and covered with a blanket, the Attorney General's Office noted.

He was released from the restraints just before 2 p.m. By 3:58 p.m., according to the Attorney General's Office, he was "found to be unresponsive and without pulse and respiration" on the bed.

"It's a tragic example of what we've been trying to illustrate to the court, and to the

---

desti
property.

**Nov. 1:** Entered state prison system as Michigan Department of Corrections prisoner No. 580074.

**March 2:** Transferred to Southern Michigan Correctional Facility in Jackson.

**Aug. 2:** Placed in four-point restraints in isolation because of unruly behavior.

**Aug. 2-6:** Received no visit from physician or psychiatrist.

**Aug. 6, 10:18 a.m.:** Given a shower and returned to his cell in restraints, covered with a blanket.

**Aug. 6, 1:58 p.m.:** Released from restraints.

**Aug. 6, 3:58 p.m.:** Found unresponsive and without a pulse.

**Sources: The Michigan Department of Corrections, Dr. Robert Cohen's Aug. 14 report to U.S. District Judge Richard Enslen and e-mail from the state Attorney General's Office to Cohen**

**What is the Hadix case?**

It is a class-action, civil rights lawsuit -- named

r a long, long time," said Patricia Streeter of Ann Arbor, an attorney for for one of the plaintiffs, Everett Hadix – that was brought by prisoners at the Jackson facilities in 1980 to correct conditions that ultimately led to prison disturbances in 1981.

what is known as the Hadix case, which triggered the federal oversight.

There's a lack of leadership and responsibility. The doctors are overworked. The Jackson facilities have become essentially a hospital, and they're still treated like a prison with average, healthy people."

The Corrections Department has been under a federal consent decree in the Hadix case since 1985 to improve medical care and other conditions at Jackson prisons. The decree covered a range of issues, including sanitation, fire protection, crowding, medical care, access to courts, mental health care and prisoner safety.

The issues included medical care, safety, food and prison programs. Most of the issues in dispute, including mental and medical health, were settled in 1985, when the parties entered into a consent judgment in which the Department of Corrections promised to take corrective action. On April 21, 2003, the federal court appointed a medical monitor because of the state's inability to correct serious problems with the care.

In June, the Free Press reported on Lloyd Byron Martell, whose cancerous polyp had gone untreated. Martell, 41, was sent home last week to die.

## A hard and desperate life

Souders of Adrian had bipolar disorder, among other conditions, according to court records. Over the last three years, he supported himself with Social Security checks, odd jobs and Dumpster diving. Attempts to reach a family member Thursday and Friday were unsuccessful.

Souders' prison sentence stems from convictions for resisting arrest, destruction of police property and assault. In March 2005, after stealing two paintball guns from a Meijer store, he walked with a stolen knife toward a police officer.

"Go ahead and kill me," he told the officer, who stunned him with a Taser. Souders told a probation officer that he wanted police to put him out of his misery.

While in an isolation cell in the Lenawee County Jail on those charges, he tried to hang himself with a noose made with fabric from jail coveralls. He was charged with malicious destruction of police property. This was on top of a record of five misdemeanors, including possession of marijuana.

Souders started his sentence Nov. 1 and was transferred to Jackson on March 2. While locked up, he received seven misconduct reports, including two for fighting.

In response to Souders' death, Cohen called an emergency meeting Wednesday with prison administrators, resulting in some of the Department of Corrections review.

Cohen's investigation could take weeks and will include a review of tapes, incident reports and medical records.

Critics say the Legislature, governor and correction officials have failed to properly oversee the $190 million a year the state spends on prison medical care, including the state's $70-million contract with Correctional Medical Services Inc.

"Responsibility is so dispersed between state agencies, a private contractor, line staff and administrators," said Sandra Bailiff Girard, executive director of Prison Legal Services of Michigan.

"No one is held responsible -- so there's little incentive to follow the rules."

Contact **JEFF GERRITT** at jgerritt@freepress.com or 313-222-6585.



This is a printer friendly version of an article from **Lansing State Journal**. To print this article open the file menu and choose Print.

Published July 28, 2006

## Governor orders
## medical check on imprisoned Kevorkian

Midday update

The Detroit News

COLDWATER, Mich. - Acting on orders from Gov. Jennifer Granholm, authorities carried out an independent medical evaluation of imprisoned assisted suicide advocate Dr. Jack Kevorkian, whose lawyer says he has less than a year to live.

Mayer Morganroth expressed hope that Granholm now would set a release date for the retired pathologist. Morganroth said last month that Kevorkian's weight had dropped to 113 pounds, Hepatitis C was attacking his major organs, and he had become diabetic.

"The governor is not in the business of second-guessing our courts, but she has commuted sentences of prisoners with life-threatening conditions," said Granholm spokeswoman Liz Boyd.

Boyd said the exam had been conducted. The results were not immediately known.

Granholm has commuted the sentences of seven terminally ill prisoners, Boyd told The Detroit News.

Kevorkian, 78, is serving a 10- to 25-year sentence for second-degree murder in the 1998 poisoning of Thomas Youk, 52, of Oakland County's Waterford Township. Youk had Lou Gehrig's disease, and Kevorkian called it a mercy killing.

He is being held at the Lakeland Correctional Facility in Coldwater, about 100 miles west-southwest of Detroit.

The state said last month that the Michigan Parole Board had rejected Kevorkian's claim that he probably would die within a year and so should have his sentence commuted. He is eligible for parole June 1, 2007.

Kevorkian has said he assisted in at least 130 deaths but has since made promises that he will not assist in a suicide if he is released from prison.

Copyright 2006 Lansing State Journal Use of this site signifies your agreement to the Terms of Service (updated 12.20.02)

# JEFF GERRITT: Paroled to die at home, and eager for justice

*August 16, 2006*

*One in an occasional series of columns on problems with the health care system for state prison inmates.*



Wearing prison khakis and a white T-shirt, Lloyd Byron Martell limped off a Greyhound bus in downtown Detroit Tuesday afternoon, looking tired but oh so happy. Smiling, he pushed a raggedy wheelchair with a cardboard box in the seat that held his medical supplies, including a month's worth of morphine and colostomy bags.

Free at last, Martell walked into his mother's arms and stayed there, quietly, for a minute, before reaching over her shoulder and shaking his stepfather's hand.

"Made it," I heard him say.

At 41, Martell has less than a year to live. His colon cancer has spread to his chest and the relentless beast can't be stopped. Still, his worst fear is over: He won't die in a state prison in Jackson. He was released Tuesday.

Like hundreds of inmates, Martell got a double sentence: one handed down by the court, another executed by the lame prison healthcare system.

In Martell's case, a one- to four-year bit in 2004 for fleeing a police officer turned into a death sentence. Martell, driving with a suspended license, took off after Redford police tried to pull him over for a broken rear window. It was a knucklehead move, but he didn't deserve to die for it.

I first wrote about Martell on June 19, revealing that his cancer probably could have been contained if doctors had treated it 20 months ago. In December 2004, Martell had what he thought was a hemorrhoid lanced. Medical records show it was actually a cancerous polyp that doctors ignored.

His story became part of a Free Press investigation into the medical care provided by the Michigan Department of Corrections and Correctional Medical Services Inc. of Missouri, a private for-profit company under contract to provide primary care physicians and other services. In hundreds of cases, diseases have been misdiagnosed, undiagnosed or treatment is delayed or denied.

When I talked to Martell's mother, Donna Martin, three weeks ago, she thought her son might die in prison. Martell was scheduled for a parole hearing on July 11, but the department canceled it because of a clerical error, rescheduling it for Aug. 15.

Delaying Martell's release was inexcusable. He's dying, he's a non-violent offender and he had already served his minimum sentence. With all the grievances he was filing and the medical care he required, Corrections should have been happy to let him go.

I called Corrections spokesman Russ Marlan, planning to write a column, and the department moved up the hearing to Aug. 2. He got his parole. Without help, however, sick and dying inmates have practically no way out. Their families are the only outside people who know, and they can't even get a return phone call from

...t Martell will die at home, surrounding by people who love him.

Monday was a good day for Martin, 60, who lives with her husband, German Martin, in Dearborn. Almost giddy, she told me about the food she bought for Martell's welcome-home dinner: chicken and dumplings, chocolate chip cookies. She picked up a toothbrush, deodorant, mouthwash, shower gel, shampoo, razors, sheets, pillows and a comforter for the bed.

"He's going to get anything he wants today," Martin said.

What Martell wants before he dies is a little peace -- and justice. He's filing a medical malpractice lawsuit against CMS and the state. He stood in the Greyhound lobby, filled with joy and rage.

"They tried to kill me in there, but it's not over," Martell told me, losing the smile for a minute. "It's going to be a short battle but a good one."

For the next few hours, though, he enjoyed the moment: the Whopper his mother bought for him on the way home, his chicken-and-dumplings dinner, the fresh clean sheets and pillow he lay on.

Today, the work that will fill the rest of his days begins. He and his mother will need to arrange medical care, as well as Social Security and Medicaid benefits.

They'll shop for new clothes, too, something without prisoner No. 335246 on it.

Martell will never get back his health but he has regained his freedom. On Tuesday afternoon, that was enough.

*JEFF GERRITT is a Free Press editorial writer. Contact him at gerritt@freepress.com or 313-222-6585.*

**Copyright © 2006 Detroit Free Press Inc.**

Robert L. Cohen, M.D.
314 W. 14th Street
New York, NY 10014

August 14, 2006

Judge Richard A. Enslen
Federal District Court
Western District of Michigan
B-35 Federal Building
410 West Michigan Avenue
Kalamazoo, MI 49007

By Facsimile and Email

Honorable Judge Enslen:

I write to alert the court to a number of serious problems with medical care at the *Hadix* facilities. The Court has scheduled a hearing in October to discuss motions regarding this matter, but recent events require me to inform you of certain serious incidents and deficiencies at the facilities, and to let you know of actions that I am taking to address and hopefully redress these issues as soon as possible.

In preparation for the scheduled October hearing I made a scheduled visit to the Jackson Medical Complex on August 8, 9, and 10. The day before my visit, Monday, August 7, I was informed by Plaintiffs' counsel of the death of MR. S., a twenty one year old man, who had been placed in the segregation unit at JMF. Mr. S. had a long history of severe mental illness, and at the time of his death was receiving two psychiatric medications, lithium and quitiapine, for treatment of manic-depression and psychosis. He was also being treated with medications for hypertension (atenelol, hydrochlorthiazide), hypothyroidism (l-thyroxine), and hyperlipidemia (gemfibrozil).

According to my preliminary investigation, at the time of his death Mr. S. was lying naked on top of a bed in a cell in the segregation unit, his arms and legs bound to the bed in full four point restraint. He had spent four days in full restraints. He was not seen by any physician from the time he was restrained to the moment of his death.

Mental health staff at JMF knew that Mr. S. was being held in four point restraints. They determined that he was actively psychotic while being restrained. No psychiatrist was consulted. No emergency psychiatric evaluation was obtained. Although mental health staff attempted to transfer him to another institution for psychiatric evaluation and treatment, no transfer occurred. I was told by a psychologist at JMF that no psychiatrist had seen any patient at JMF for more than six weeks prior to Mr. S.' death.

As you are aware, I have been extremely concerned about the care received by prisoners housed in the Segregation unit at JMF. My concerns arose from the serious deficiencies I observed and reported to the Court, as well as my experience and knowledge of the intrinsic danger to the health of prisoners

which occurs when they are placed in the punitive administrative environment of segregation status.

My preliminary findings strongly suggest that Mr. S.' death was predictable and preventable. Actively psychotic patients with cardiac conditions placed in four point restraint are at significant risk of death. The temperature humidity index in the segregation unit during the week prior to Mr. S.' death had reached 106. Mr. S. had multiple medical conditions, including hypertension, hypothyroidism, and manic-depressive illness which placed him at risk of severe heat related illness. He was taking six different medications. Several of these drugs are known to seriously impair heat regulation. Most importantly, Mr. S.' was kept in four point restraints for four days without physician care. During this period he was noted to be agitated, disoriented, psychotic, and was urinating on his bed. Despite this emergency psychiatric symptoms, he was not seen by a psychiatrist, because no psychiatrist was working at JMF. The death of MR. S., a twenty one year old man, was a terrible unnecessary tragedy.

Although the circumstances of Mr. S.' death overwhelmed my visit to the *Hadix* facilities, there are a number of additional continuing serious deficiencies in the medical program which require immediate action, some of which may have contributed to the abject failure to provide Mr. S.' with medical care. Specifically, there is a critical shortage of medical staff at JMF, and serious medical staff shortages throughout the medical program. This is an emergency situation which has gone on for too long and is having an extremely adverse effect on patient care.

Because of this emergency, I have asked the parties to meet on Wednesday, August 16, in Ann Arbor. At that time we will discuss Mr. S.' death, Administrative Segregation, Medical Restraint Policy and Practice, Psychiatric coverage at JMF, CMS staffing of the Hadix facilities, Medical Records, Pharmacy, and Heat Related Injuries.

Following the meeting I will report to you on any progress I have made with the parties in addressing these issues, and let you know if there are any problems which will require the Court's attention before the scheduled October hearing.

Sincerely,

Robert L. Cohen, MD
Associate Monitor

cc: Ned Benton
    Pete Govorchin
    George Pramstaller
    Barb Hladki
    Elizabeth Alexander
    Pat Streeter
    Michael Barnhart

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

WILL HENRY JOHNSON,

                Plaintiff,              CIVIL NO. 06-CV-11608

v.                             HONORABLE ROBERT H. CLELAND

**DR. BENCY MATHAI, et al.**      MAGISTRATE JUDGE MONA K. MAJZOUB

                Defendant(s).

_____/

## PROOF OF SERVICE

I, WILL HENRY JOHNSON, the Plaintiff in the above captioned matter, being first duly sworn depose and say that on __9__ / __6__ / __2006__ I did serve <u>one original and four copies</u> of the enclosed PLAINTIFF'S MOTION TO ADD OTHER DEFENDANT NAMES TO PLAINTIFF'S 42 USC 1983, Proof of Service to the Defendants Doctor Bency Mathai;  Dr. Emmanuel Johnson;  Dr. Savi Conney; Dr. Keith Camann; Correctional Medical Services Inc., of 1790 East Parnall Road, Jackson, Michigan 49201-7139, by placing them in the Mail Hall, Legal Mail, 1790 East Parnall Road, Jackson, Michigan 49201-7139, and sending them to the Court Clerk for proper legal processing.

See below for Court address:

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**OFFICE OF THE CLERK**
**THEODORE LEVIN UNITED STATES COURTHOUSE**
**231 WEST LAFAYETTE BLVD. - ROOM 564**
**DETROIT, MICHIGAN 48226**

Dated : 9 / 6 / 2006

_Will Johnson_
Mr. Will Henry Johnson, in Pro Per

Sworn before me on this __6th__ day of ___SEPT___, 2006

NOTARY PUBLIC

LARRY CARTER
NOTARY PUBLIC JACKSON CO., MI
MY COMMISSION EXPIRES Aug 14, 2008